**Abdullah Seifuddin SHABAZZ, et al., Plaintiffs–Appellees/Cross–Appellants,**

v.

**Gary GABRY, et al., Defendants–Appellants/Cross–Appellees.**

**Nos. 96–1059, 96–1060.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 15, 1996.

Decided Aug. 22, 1997.

70 spaces were almost completely taken up by the 50 office employees.

Paul D. Reingold (argued and briefed), Michigan Clinical Law Program, Ann Arbor, MI, for Plaintiffs–Appellees.

Richard M.C. Adams (argued and briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Defendants–Appellants.

Before: KEITH, MERRITT, and SUHRHEINRICH, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

In 1992 the State of Michigan amended its parole laws to postpone the initial mandatory parole review hearings of certain state prisoners and to reduce the frequency of their subsequent mandatory hearings. This prisoner class action suit, brought under 42 U.S.C. § 1983, challenges the retroactive application of the 1992 amendments as violative of the Ex Post Facto Clause of the United States Constitution. U.S. Const. art. 1, § 10, cl. 1. We conclude that it does not.

## I. Background

The Michigan state legislature has frequently revised the laws governing parole. The 1992 amendments establish a uniform mandatory parole interview schedule for inmates who committed their crimes before the effective date of the act on October 1, 1992, and received mandatory life, parolable life, or long indeterminate sentences. The 1992 version of Michigan Compiled Laws §§ 791.234 and 791.244 ("M.C.L.") requires that all inmates with mandatory life sentences, parolable life sentences, and long indeterminate sentences receive their initial parole interviews after ten years of incarceration and every five years thereafter, establishing a "10 + 5 + 5 ..." schedule.[1] An inmate's initial hearing and all subsequent hearings under the 1992 amendments occur later in his incarceration than they did under previous parole regimes.

---

1. Inmates convicted of a crime committed on or after October 1, 1992, receive their initial interviews after fifteen years and every five years thereafter.

Plaintiffs are inmates who committed their offenses before October 1, 1992, and are currently in the custody of the Michigan Department of Corrections ("MDOC"). Defendants are members of the Michigan Parole Board ("Parole Board"). The district court granted Plaintiffs' motion for class certification and divided Plaintiffs into three subclasses based on the type of sentence they received and Michigan's parole law in effect when they were sentenced.

Subclass 1 consists of those inmates who committed their crimes and were convicted between 1982–1992 receiving mandatory life sentences, parolable life sentences or long indeterminate sentences. Between 1982 and 1992, the 1982 amendments to M.C.L. §§ 791.234 and 791.244 governed the frequency of Parole Board review for these inmates. Under the 1982 amendments, one member of the Parole Board would interview inmates in Subclass 1 after four years and every two years thereafter, creating a "4 + 2 + 2 ..." mandatory interview schedule. During this period, inmates sentenced to parolable life and long indeterminate sentences became eligible for parole only after serving ten years of their sentences.[2] Inmates with mandatory life sentences were not eligible for parole. Furthermore, the 1982 amendments authorized the Parole Board to grant parole on its own initiative without an interview.[3]

Subclass 2 consists of those inmates who committed their crimes and were convicted between 1977 and 1982 receiving parolable life sentences or long indeterminate sentences.[4] Between 1977 and 1982, the parole statutes did not govern the frequency of parole hearings. Instead, the MDOC devised its own rules to conduct parole hearings. In 1977, the MDOC promulgated administrative rule 791.7710 ("Rule 710"),[5] which required the Parole Board to interview members of Subclass 2 after seven years, again after three years, and every year thereafter, creating a mandatory interview schedule of "7 + 3 + 1 + 1...."[6]

Subclass 3 consists of those inmates who committed their crimes and were convicted between 1977–1982 receiving mandatory life sentences, and those inmates who committed their crimes and were convicted prior to 1977 receiving mandatory life, parolable life, or long indeterminate sentences. When these prisoners were sentenced, no applicable statute or codified administrative regulation governed the frequency of Parole Board reviews. Rather, the internal operating memoranda of the Parole Board and policy directives of the MDOC controlled. Under Board Memo 8.02, the Parole Board interviewed inmates with parolable life sentences and long indeterminate sentences after seven years and every three years thereafter, creating a "7 + 3 + 3 ..." mandatory hearing schedule. The Parole Board interviewed inmates with mandatory life sentences after ten years, and every three years thereafter, creating a "10 + 3 + 3 ..." mandatory hearing schedule.

The 1992 amendments altered the parole process in several ways. First, they delay the initial interview until a prisoner has served ten years of his sentence, instead of four years under the 1982–1992 regime and seven to ten years under previous regimes. Second, they decrease the frequency of subsequent mandatory parole eligibility interviews to once every five years. Third, the

---

**2.** The requirement that prisoners serving parolable life and long indeterminate sentences were not eligible for parole until they had served ten years remained unchanged during all of the parole regimes.

**3.** Taken together, the 1982 amendments required regular parole interviews, but not if the Parole Board decided to grant parole. However, the 1982 amendments required an interview if the Parole Board decided to deny parole to a prisoner.

**4.** Inmates who committed their crimes and were convicted between 1977 and 1982 receiving mandatory life sentences comprise part of Subclass 3.

**5.** The district court noted that the Parole Board never applied Rule 710, *Shabazz v. Gabry*, 900 F.Supp. 118, 122 n. 4 (E.D.Mich.1995), but rather continued to apply Board Memo 8.02 (effective date July 1, 1976), which granted an initial interview to Subclass 2 inmates after serving seven years and every three years thereafter, thus creating a "7 + 3 + 3 ..." schedule.

**6.** Annual reinterviews did not begin until after an inmate was eligible for parole, which occurred after 10 years of incarceration for members of Subclass 2.

1992 amendments grant the Parole Board authority to deny parole without an interview to prisoners with a low probability of parole. However, one important element remains unchanged by the 1992 amendments; the Parole Board can still grant parole on its own initiative to certain prisoners without an interview.[7]

■ Plaintiffs in each subclass alleged that the retroactive application of the 1992 amendments violates the Ex Post Facto Clause by postponing their initial mandatory parole hearing and decreasing the frequency of subsequent mandatory hearings, thus decreasing their eligibility for early release. On motions for summary judgment, the district court held that the 1992 amendments violate the Ex Post Facto Clause as to Subclasses 1 and 2, but not as to Subclass 3. This Court reviews the grant of summary judgment de novo. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994).

## II. Law

### A. Ex Post Facto Law

Plaintiffs challenge the 1992 amendments under 42 U.S.C. § 1983, claiming that the amendments violate their rights under the Ex Post Facto Clause. Under 42 U.S.C. § 1983, Plaintiffs must show that a person acting under color of state law deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

■ To determine whether a law violates the Ex Post Facto Clause, we must examine the relevant law in effect at the time an offense was committed and compare it with the retroactively-applied version of the law. "To fall within the ex post facto prohibition, a law must be retrospective—that is 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981), by ... increasing the punishment for the crime, see *Collins v. Youngblood*, 497 U.S. 37, 50, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30 (1990)." [8] *Lynce v. Mathis*, —— U.S. ——, ——, 117 S.Ct. 891, 896, 137 L.Ed.2d 63 (1997). This Court has held that "parole consideration is a part of the law annexed to the crime." *Ruip v. United States*, 555 F.2d 1331, 1335 (6th Cir.1977). This Court has also recognized that "[t]he focus in determining whether a new law violates the ex post facto clause is the time the offense was committed." *Kellogg v. Shoemaker*, 46 F.3d 503, 509 (6th Cir.) *cert. denied*, —— U.S. ——, 116 S.Ct. 120, 133 L.Ed.2d 70, and *cert. denied*, —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995) (citing *Weaver*, 450 U.S. at 31, 101 S.Ct. at 965).

---

7. It is helpful to think of the 1992 amendments as creating three categories of prisoners with respect to parole interviews. The first category consists of prisoners with a high probability of parole, whom the Parole Board intends to parole. This category of prisoners will be granted parole without an interview because the state believes that such an interview is unnecessary and an inefficient use of resources. The second category consists of prisoners with a low probability of being paroled, whom the Parole Board therefore does not intend to parole and need not interview before denying parole. The third category consists of prisoners between categories one and two who have neither a low nor a high probability of parole. The Parole Board may parole a prisoner from this category without an interview. But, if the Parole Board does not grant parole, it must interview the prisoner. Therefore, under the 1992 amendments, the Parole Board must interview only those prisoners with neither a high nor a low probability of parole, whom the Parole Board decides not to parole. The Parole Board may determine the parole status of all other prisoners without an interview.

8. The Supreme Court has distinguished four legislative acts which implicate the core concern of the Ex Post Facto Clause:

"1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime*, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender.*"
*Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)).

## B. *Morales*

We analyze Ex Post Facto Clause challenges to amended parole laws in light of the controlling Supreme Court precedent in *California Department of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). In *Morales,* a state prisoner incarcerated for two murders challenged the constitutionality of California's amended parole laws that increased the time between his parole hearings. Under the existing law when the prisoner committed his second murder, he was entitled to annual subsequent parole eligibility hearings. The amendments, however, allowed the parole board to postpone his subsequent parole hearings to every three years if the board (1) found that parole was not reasonably expected during the interim and (2) articulated the basis for its finding.

In deciding *Morales,* the Court refused to articulate a single formula to identify those legislative changes that have a sufficient impact on substantive crimes or punishments to qualify as ex post facto laws. Instead, the Court developed a test in which it inquired whether the amendments "produce[ ] a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 509, 115 S.Ct. at 1603 (footnote omitted). Under this "sufficient risk" test, the Court upheld California's amendments as constitutional, because they "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the Ex Post Facto Clause." *Id.* (citing *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977)).

In *Morales,* the Court focused on the following four features of the California amendments: (1) the amendments applied only to double murderers, a class of prisoners for whom the likelihood of parole is quite remote; (2) the parole board's authority was carefully tailored to relieve the costly and time-consuming burden of scheduling parole hearings for prisoners with little chance of release on parole; (3) the parole board retained the authority to tailor the frequency of subsequent parole hearings to a prisoner's particular circumstances; and (4) the amendments permitted a prisoner whose parolability improved during the interim to request an expedited hearing. *Id.* at 508–14, 115 S.Ct. at 1603–05.

Analyzing ex post facto challenges after *Morales* presents some problems. While it is clear that we must apply *Morales's* "sufficient risk" test, it is less clear what factors are determinative. Although the Court focused on four elements particular to the California amendments in *Morales,* the Court also expressed "no view as to the constitutionality of any of a number of other statutes that might alter the timing of parole hearings under circumstances different from those present here." *Id.* at 509 n. 5, 115 S.Ct. at 1603 n. 5.

## C. District Court Decision

The district court in this case distinguished in three ways Michigan's 1992 parole amendments from the parole amendments at issue in *Morales.* First, and perhaps most importantly, the 1992 amendments apply to a broad class of inmates for whom the chance of parole is not nearly as remote as it was for the multiple murderers with little chance of parole in *Morales. Shabazz v. Gabry,* 900 F.Supp. 118, 126 (E.D.Mich.1995). Second, the 1992 amendments do not require an individual assessment of the parolability of each inmate, as the California amendments required in *Morales. Id.* Third, the 1992 amendments postpone both the initial mandatory parole hearing and subsequent periodic hearings, unlike the amendments in *Morales* which only delayed subsequent hearings. *Id.*

After distinguishing *Morales,* the district court analogized to two pre-*Morales* cases that the court believed were factually more similar: *Akins v. Snow,* 922 F.2d 1558 (11th Cir.1991),[9] and *Roller v. Cavanaugh,* 984

9. In *Akins v. Snow,* 922 F.2d 1558 (11th Cir. 1991), the Eleventh Circuit held that an amendment increasing the interval between parole hearings violated the Ex Post Facto Clause because the hearing was an important legal and practical factor in a prisoner's parole eligibility. *Id.* at 1565. The court reasoned that since the parole board was required to hold some type of parole reconsideration hearing before granting

F.2d 120 (4th Cir.1993).[10] The district court analyzed the 1992 amendments in light of these two cases and concluded that the amendments produce a "sufficient risk of increasing the measure of punishment attached to the covered crimes" for a significant number of Subclass 1 and 2 prisoners, and consequently, violate the Ex Post Facto Clause as to Subclasses 1 and 2. *Shabazz*, 900 F.Supp. at 128–30. The district court also held that Subclass 3 inmates suffer no ex post facto violation because the internal memoranda and policy directives of the MDOC and the Parole Board in effect when members of Subclass 3 committed their crimes did not grant them any substantive rights, and, therefore, are not laws for ex post facto purposes.

## III.  Analysis

On appeal, Plaintiffs allege that the 1992 amendments to the parole laws violate the Ex Post Facto Clause because the decreased number of mandatory parole interviews decreases their chances for parole, which in turn imposes greater punishment on them than the law did when they committed their crimes.  For the reasons stated below, we reverse the district court's finding that the 1992 amendments violate the Ex Post Facto Clause as to Subclasses 1 and 2, but affirm its finding that the 1992 amendments do not violate the Ex Post Facto Clause as to Subclass 3.

### A.  Subclasses 1 and 2

■ Under the *Morales* test the 1992 amendments do not violate the Ex Post Facto Clause as to Subclasses 1 and 2. The *Morales* test requires a showing of sufficient risk of increased punishment, not merely "some ambiguous sort of 'disadvantage' " suffered by an inmate. *Morales*, 514 U.S. at 506 n. 3, 115 S.Ct. at 1602 n. 3. Where amendments to state parole laws postpone initial mandatory parole hearings and decrease the frequency of subsequent mandatory hearings, but nevertheless provide other viable opportunities for parole, such amendments do not produce a "sufficient risk of increasing the measure of punishment attached to the covered crimes." The 1992 amendments do not change the standard for parole, but allow prisoners ample opportunity to petition the Parole Board for interviews. Further, the 1992 amendments allow the Parole Board to grant parole interviews of its own volition, and to grant prisoners parole without an interview.[11]

■ The district court's analysis in this case is not persuasive. The court conceded that there exists no *legal* nexus between the decrease in *regularly* scheduled parole hearings and eligibility for parole. The district court also admitted that no reliable statistical analysis was available in this case because the statute had been in effect for too short a period. *Shabazz*, 900 F.Supp. at 127. Rather, the court relied on an assortment of

---

parole, an inmate was effectively ineligible for parole between two hearings. *Id.* at 1562.

**10.** In *Roller v. Cavanaugh*, 984 F.2d 120 (4th Cir.), the Fourth Circuit held that a South Carolina amendment reducing the frequency of parole hearings was an ex post facto violation because of the close nexus between the availability of hearings and eligibility for parole. Although prisoners were technically eligible for parole without a hearing, the court held that the reduction in parole hearings substantively disadvantaged prisoners by affecting their eligibility for parole. The *Roller* court commented:

Defendants … point out that Roller becomes and remains "eligible" for parole just as he would have under the law in effect when he committed his crimes. The defendants do not, however, identify any benefit flowing from the status of "eligibility" other than the right to be heard and considered for parole. Eligibility without consideration is a cold comfort.

*Roller*, 984 F.2d at 123.

**11.** Defendants argue that the district court improperly included inmates with mandatory life sentences in Subclass 1, because such prisoners are never eligible for parole. These prisoners must seek release solely from the governor. Mich. Const. art. V, § 14; *People v. Brown*, 54 Mich. 15, 19 N.W. 571, 578 (1884) (holding that the power to pardon is vested exclusively in the governor). There is no nexus between the frequency of parole interviews and the grant of parole for these prisoners because they are never eligible for parole. It is impossible for the 1992 amendments to increase the measure of punishment attached to their crimes. The Parole Board has the power only to recommend to the governor that he grant a reprieve, commutation, or pardon. We hold that this group of prisoners is properly included in Subclass 1, and that the retroactive application of the 1992 amendments does not violate the Ex Post Facto Clause as to them.

anecdotal observations and personal speculation to conclude that the amendments *may* present sufficient risk of increased punishment. This holding is erroneous in light of the Supreme Court's explicit rejection in *Morales* of the expansive view that "the Ex Post Facto Clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment." *Morales,* 514 U.S. at 505, 115 S.Ct. at 1602. Such tenuous support for this conclusion is insufficient to render the 1992 amendments unconstitutional.[12]

Moreover, the district court's reliance on the pre-*Morales* circuit court cases of *Akins* and *Roller* is unwarranted in view of subsequent case law. The Eleventh Circuit flatly stated that "[i]n light of *Morales,* the continuing validity of *Akins* is questionable." *Jones v. Georgia State Bd. of Pardons and Paroles,* 59 F.3d 1145, 1149 n. 8 (11th Cir. 1995). The Fourth Circuit formally reconsidered its holding in *Roller,* stating "[a]t best, Roller can contend that he will miss 'an opportunity to take advantage of provisions for early release,' and under *Morales* that is simply insufficient to establish an ex post facto violation." *Roller v. Gunn,* 107 F.3d 227, 237 (4th Cir.1997) (quoting *Morales,* 514 U.S. at 506 n. 3, 115 S.Ct. at 1602 n. 3). In light of the foregoing, we hold that the 1992 amendments do not produce a sufficient risk of increasing the measure of punishment attached to the covered crime, and as such, do not violate the Ex Post Facto Clause as to Subclasses 1 and 2.

## B. Subclass 3

■ When the members of Subclass 3 were sentenced, internal operating memoranda and policy directives of the Parole Board and the MDOC established the timing of parole hearings. These memoranda and directives do not have the force and character of law for ex post facto·analysis, and, therefore, Subclass 3's ex post facto challenge fails. This Court held in *Ruip,* 555 F.2d at 1335, that administrative guidelines for granting parole are not laws subject to the Ex Post Facto Clause because they are merely flexible guideposts which assist the Parole Commission in exercising its discretion, where the Parole Commission remains free to make parole decisions outside of the guidelines.

Case law from other circuits supports this position. The Eighth Circuit held that parole regulations issued by the Minnesota Department of Corrections were not laws for ex post facto purposes because the regulations were simply procedural aids to the parole board vested with discretionary authority to release eligible inmates on parole. *Bailey v. Gardebring,* 940 F.2d 1150, 1156–57 (8th Cir. 1991). The Ninth Circuit determined that "the operative factor in assessing whether a directive constitutes a 'law' for ex post facto purposes is the discretion that the [parole board] retains to modify that directive...." *Smith v. United States Parole Comm'n,* 875 F.2d 1361, 1367 (9th Cir.1988) (citing *Wallace v. Christensen,* 802 F.2d 1539, 1554 (9th Cir. 1986) (en banc)).

In this case, the Parole Board and the MDOC's memoranda and directives in effect before 1982 merely operated as guidelines to aid the Parole Board in exercising its discretion. Moreover, the Parole Board retained discretion to modify its own policies. Thus, the memoranda and directives from the pre–1982 period, which did not provide any substantive rights or bind the Parole Board's discretion, are not laws for ex post facto analysis.

---

**12.** We agree, however, with the district court's conclusion that Rule 710 should be considered a law for purposes of ex post facto analysis. Michigan law provides that regulations promulgated by a state agency in accordance with the procedures of the Administrative Procedures Act and codified in the Michigan Administrative Code after public comment, have the force and effect of law. *Clonlara, Inc. v. State Bd. of Educ.,* 442 Mich. 230, 501 N.W.2d 88, 93 (1993); *see also Kellogg v. Shoemaker,* 46 F.3d 503, 509 (6th Cir.1995) (holding that an administrative regulation promulgated by Ohio's parole agency had the same effect as legislation for the purposes of ex post facto consideration).

We also agree with the district court's conclusion that the ex post facto analysis for Subclass 2 should be based on a comparison between the 1977 and the 1992 statutes, not on a comparison between the 1982 and 1992 statutes, despite the fact that the 1982 statutes were retroactively applied. Ex post facto analysis must be based on the laws in effect at the time a crime was committed. *See Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981).

Furthermore, the policies behind the Ex Post Facto Clause do not support the position that internal policy directives and memoranda should be construed as laws. The Ex Post Facto Clause exists to protect citizens from retroactive increases in punishment. Changes in the administration and enforcement of statutes have little impact on these public expectations. *Prater v. United States Parole Comm'n*, 802 F.2d 948, 952–53 (7th Cir.1986) (en banc) (holding that written policies do not qualify as laws for purposes of ex post facto analysis). In this case, the internal memoranda and policy directives, unlike administrative regulations promulgated under the APA, are not published in the Michigan Administrative Code or presented to the public for comment. Accordingly, the Parole Board and the MDOC's policies and directives did not likely influence public expectations as to parole or create a reliance interest in the public on a particular parole hearing schedule.

Therefore, we agree with the district court's holding that the 1992 amendments as applied to members of Subclass 3 do not violate the Ex Post Facto Clause because the 1992 amendments only alter internal memoranda and policy directives that *did not provide* Subclass 3 inmates with substantive rights or bind the discretion of the Parole Board members.

### IV. Conclusion

Based on the foregoing analysis, we conclude that the retroactive application of the mandatory parole interview schedule established by the 1992 amendments is constitutional as to all subclasses and must be allowed to stand. Thus, the district court's holding as to Subclasses 1 and 2 is **REVERSED** and the district court's holding with respect to Subclass 3 is **AFFIRMED**. The matter is **REMANDED** for further proceedings consistent with this opinion.