PEOPLE v HILL

Docket No. 253327. Submitted June 7, 2005, at Lansing. Decided July 12, 2005, at 9:15 a.m. Leave to appeal sought.

Edward Hill was convicted of armed robbery in 1976 in the Washtenaw Circuit Court. The court, William F. Ager, Jr., J., offered the defendant a choice of sentences, either a term of imprisonment for forty to sixty years or life imprisonment. Following advice by his attorney that he would be eligible for parole sooner with a life sentence, the defendant chose the life sentence. In 2002, the defendant moved for relief from the judgment, arguing in part that changes in parole law and practices after his sentencing have effectively eliminated parole for prisoners serving parolable life sentences. The court, Archie C. Brown, J., denied the motion. The defendant appealed by delayed leave granted, with the issue limited to whether the parole board's "life means life" policy violates the Ex Post Facto Clause, US Const, art I, § 10.

The Court of Appeals *held*:

The Ex Post Facto Clause prohibits the enactment of a law that, when applied, increases the punishment for a crime committed before its effective date. Assuming for the sake of argument that the parole board has a "life means life" policy such as the one the defendant describes under which the parole board rarely releases prisoners serving life sentences, the defendant has failed to establish that the policy was not in effect when he was sentenced. On the record before the Court of Appeals, it appears that enforcing a valid life sentence has almost invariably been the parole board's policy and practice. Accordingly, there was no government action instituted after the defendant's sentencing that produced a significant risk of increasing his punishment, and consequently no ex post facto violation. Parole eligibility does not mean that a defendant has a right to parole.

Affirmed.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Brian L. Mackie*, Prosecuting Attorney, and *David A. King*, Senior Assistant Prosecuting Attorney, for the people.

Michigan Clinical Law Program (by *Paul D. Reingold*) for the defendant.

Before: OWENS, P.J., and CAVANAGH and NEFF, JJ.

PER CURIAM. Defendant appeals by delayed leave granted, with the issue "limited to the question whether the parole board's 'life means life' policy violates the *Ex Post Facto* Clause, U.S. Const, art I, § 10, cl 1." After review de novo of this question of law, we conclude that there is no such violation. See *People v Westman*, 262 Mich App 184, 187; 685 NW2d 423 (2004).

Defendant was convicted of armed robbery in 1976. It appears that the sentencing judge gave defendant a choice of sentences, either a term of forty to sixty years' imprisonment or a parolable life term. Apparently, defendant's counsel advised defendant that he would be eligible for release sooner with a life sentence than with the sentence of an indeterminate term of years, and defendant chose the life sentence. That advice was allegedly supported by information from the Michigan Department of Corrections indicating that for most similarly situated offenders, those with a parolable life sentence could be released after serving twelve to fifteen years, while those with a forty- to sixty-year sentence would not be eligible for parole until after serving sixteen years. However, in the years since defendant's sentencing, particularly in 1992, the parole statutes were revised and the parole board was reorganized. Defendant claims that with the reorganization of the parole board in 1992 came a change in philosophy and decision-making policy with regard to the parole consideration given to parolable lifers, including the implementation of a "life means life" policy.

On appeal, defendant argues that the application of this "life means life" policy to his sentence violates the federal Ex Post Facto Clause because his punishment has been increased. Defendant claims that this policy change, in practice, effectively rewrites his sentence and essentially eliminates parole for parolable lifers because "the parole board is no longer exercising its discretion in parolable lifer cases. Instead it has adopted a blanket policy, applied retroactively, of almost never releasing parolable lifers, no matter how strong their institutional records or how long their terms of incarceration." We disagree.

The first "lifer law" came into effect in 1941, granting parole eligibility to prisoners sentenced to life in prison for crimes other than first-degree murder after serving ten calendar years. Before its enactment, those life sentences would have to have been served in their entirety unless commuted by the Governor or a pardon was granted. The lifer law has been revised through the years, but at the time of defendant's sentencing, MCL 791.234 provided that he would be subject to the jurisdiction and authority of the parole board after serving ten calendar years. It also appears that at the time of defendant's sentencing, a perception commonly held by legal practitioners, as well as some judges, was that a "parolable life" sentence did not mean life; rather, it meant between twelve and twenty years in prison. See, e.g., *People v Lino (After Remand)*, 213 Mich App 89, 95-98; 539 NW2d 545 (1995), overruled by *People v Carson*, 220 Mich App 662, 673-674 (1996); see, also, Prisons and Corrections Section of the State Bar of Michigan, *What should "parolable life" mean? Judges respond to the controversy* (March 2002), available at <http://www.capps-mi.org/pdfdocs/JudicialSurvey.pdf> (accessed June 24, 2005). In fact, defendant's sentencing judge also believed that a parolable life sentence was

less harsh than a long indeterminate term sentence because of the earlier opportunity for parole. This belief seems to have been somewhat supported by parole data; for example, from 1941 through 1974, 416 parole-eligible lifers were paroled, averaging twelve a year.

However, it appears that there was a change in parole practice, because from 1975 through 1992 only sixty-five parole-eligible lifers were paroled, for an average of less than four a year. In 1992, the parole board was restructured, both in number and composition, and it continued the practice of the prior seventeen years in granting fewer paroles. "The primary goal of the reorganization was to increase public safety by minimizing the number of dangerous and assaultive prisoners being placed on parole." Michigan Parole Board website, Introduction <http://www.michigan.gov/corrections/0,1607,7-119-1378-22894--,00.html> (accessed June 24, 2005). In a 1997 status report, then Michigan Department of Corrections Director Kenneth L. McGinnis, stated:

> To reinforce public confidence in Michigan's penal system, Gov. John Engler in 1992 ordered an overhaul of the Parole Board and the way in which paroles were granted. The intent of the overhaul was to make Michigan's communities safer by making more criminals serve more time and keeping many more locked up for as long as possible.

> \* \* \*

> Among the most important differences since the overhaul is a Parole Board that is much less willing to release criminals who complete their minimum sentences—and much less willing to release criminals at all, forcing many to serve their maximum sentences. [Michigan Department of Corrections, *Five years after: An analysis of the Michigan parole board since 1992* (September 1997).]

On September 28, 1999, the chairperson of the parole board, Stephen Marschke, testified before the Legislature in support of proposed legislation[1] to amend the life law to eliminate the mandatory interview requirement. His written testimony stated:

> It has been a long standing philosophy of the Michigan Parole Board that a life sentence means just that—life in prison. Of course, there are exceptions and parole may be appropriate under certain circumstances. The process to handle parole for a prisoner serving a life sentence is when a majority of the parole board votes to send that case to a public hearing. It is the parole board's belief that something exceptional must occur which would cause the parole board to request the sentencing judge or Governor to set aside a life sentence. Good behavior is expected and is not in and of itself grounds for parole.

And, in 2001, in prepared materials distributed at a judicial conference, representatives of the parole board stated:

> "There are some who believe a life sentence equates to a number of years of confinement; i.e. a life sentence equals 10, 20, 30 years, etc. The parole board believes a life sentence means life in prison. There is nothing which exists in statute that allows the parole board to think, or do, otherwise." [Material prepared by Martin, Steinman & Marschke, Michigan Department of Corrections, Field Operations Administration, Office of the Parole Board, for the Michigan Judges Association Annual Judicial Conference, Traverse City, Michigan, October 1-3, 2001, quoted in a report by Citizens Alliance on Prisons & Public Spending, *No way out: Michigan's parole board redefines the meaning of "life"* (September 2004), p 15, available at <http://www.capps-mi.org/pdfdocs/fullliferreport.pdf> (accessed June 24, 2005).]

---

[1] See HB 4624 of 1999, subsequently enacted as 1999 PA 191, amending MCL 791.234 and 791.244.

Defendant argues that these various statements, along with the parole board's actual practices, demonstrate a "life means life" policy that was newly instituted after he was sentenced to life in prison and has the effect of increasing his punishment in violation of the federal Ex Post Facto Clause.

The Ex Post Facto Clause of the United States Constitution prohibits the enactment of a law that, when applied, increases the punishment for a crime committed before its effective date. See US Const, art I, § 10; *Riley v Parole Bd*, 216 Mich App 242, 244; 548 NW2d 686 (1996). It was "intended to secure substantial personal rights against arbitrary and oppressive legislation, and not to limit legislative control of remedies and procedure that do not affect matters of substance." *People v Russo*, 439 Mich 584, 592; 487 NW2d 698 (1992). Accordingly, before we address defendant's ex post facto challenge, it must be determined whether this "life means life" policy exists, and whether it was enacted after defendant was sentenced.

Even if we assume arguendo that this "life means life" policy exists, we must conclude that defendant has failed to establish that it was not in effect when defendant was sentenced to parolable life imprisonment. As noted above, from 1941 through 1974, only about twelve parole-eligible lifers were paroled a year. From 1975 through 1992, even before this alleged "life means life" policy was instituted according to defendant, fewer than four parolable lifers were paroled a year. However, there is a discrepancy in the statistical data. In *Lino (After Remand)*, *supra* at 97-98, the Court indicated that from 1986 through 1990, only seven parolable lifers were paroled, including two in 1990, and one was paroled in 1991 and another in 1992. However, even after this so-called "life means life" policy was

allegedly adopted in 1992, fourteen parolable lifers were paroled in 1994 and twelve were paroled from 1995 through 1998. See report by Citizens Alliance on Prisons & Public Spending, *No way out: Michigan's parole board redefines the meaning of "life"* (September 2004), p 10, available at <http://www.capps-mi.org/pdfdocs/fulliferreport.pdf> (accessed June 24, 2005). Further, it appears to have been well-known that most lifers were never granted parole. See *People v Bates*, 439 Mich 960, 961 (1992) (statement of CAVANAGH, C.J., dissenting from denial of leave to appeal). From the data provided by defendant, as well as our own research, it is unclear why in 1976 legal practitioners and sentencing judges would have believed that a sentence of parolable life meant that a prisoner would be released shortly after they became eligible for parole.

On the record before us, defendant has failed to establish that there was a discernable change in practice with respect to parole decisions after the alleged adoption of a "life means life" policy. It appears that enforcing a valid life sentence has almost invariably been the policy and practice of the parole board. Accordingly, there was no government action instituted after defendant's sentencing that produced a significant risk of increasing his punishment. See *California Dep't of Corrections v Morales*, 514 US 499, 509; 115 S Ct 1597; 131 L Ed 2d 588 (1995). There was always a "significant risk" that defendant would be made to serve his life sentence. As has been stated on numerous occasions, parole eligibility does not mean that a defendant has a right to parole. See *Morales v Parole Bd*, 260 Mich App 29, 39; 676 NW2d 221 (2003).

It seems that defendant's argument is primarily that the parole board has been granted almost unfettered discretion with regard to its parole decisions. Defendant

cites the alleged lack of meaningful consideration granted to parolable lifers since the parole board is not required to prepare parole guidelines until confronting a release decision, *Jackson v Dep't of Corrections*, 247 Mich App 380, 383-384; 636 NW2d 305 (2001), and the fact that, for the most part, its decisions of "no interest in taking action" toward release are relatively unsupported and unappealable, *In re Parole of Johnson*, 235 Mich App 21, 25-26; 596 NW2d 202 (1999). However, those are issues for the Legislature to consider and remedy if necessary.

In sum, the Department of Corrections and the parole board's articulation of an alleged "life means life" policy merely states the policy and practice that has been in effect since before defendant was sentenced to a parolable life term. Accordingly, there is no ex post facto violation.

Affirmed.